Good morning, Your Honor. May it please the Court, my name is Stuart Felinski, and I represent the Petitioner, Wan Hai-Chung, in this matter. In the briefing, the issues were basically two. One was to the merits on the abandonment, and the other one was to the procedural errors which we alleged. As to the procedural errors, it appears that this Court's decision in Malkit-Singh disposes of those issues. How so? Well, Malkit-Singh involved the case where the BIA inexplicably started using the wrong address in the middle of a case. Unlike Malkit-Singh, though, a complete briefing was made to the Board of Immigration. I have a problem with that. Here, the attorney for Wan, if I'm remembering the right case, sent a letter in on the day the brief was due saying, I want an extension. The notice says right on it, don't count on an extension. Your brief is due the day it's due. The extension was requested to a subsequent designated date, so the lawyer knew what date he was asking for. Correct, Your Honor. He didn't get back the notice, oh, you've got your extension. All he got back was nothing. But he didn't file his brief on the date it was due, even if he'd gotten what he asked for, which he did. Plus, I don't see that there's a denial of a hearing, due process notice in a hearing, because the lawyer got to file a responsive brief that the BIA accepted, so that that side was heard anyway. Your Honor, I was the attorney. First of all, I will admit to an error in our office procedures that the due dates get calendared in, or at that time they got calendared in when we got the notice back. So there was an error in our office. That will not happen again. We learn from our mistakes. The question, that's not the question. The question is, you were given a date to file the brief by, you were told, even if you asked for an extension, you have to file by the date unless you hear from us, and you didn't. So how does a BIA get tagged with some kind of a due process violation? Your Honor, we made the appropriate motion. And you were told ahead of time that that doesn't count if you don't hear from them. You have to file by the due date. That's right on your original notice. So you knew that. So how does it count as they understand the foul-up? The question is, you're trying to turn your foul-up into their due process violation. How do you accomplish that? One, the Board did grant an extension. And you didn't file by the time they granted it, even did you? They gave you just what you wanted, and you still didn't file on time. They gave you more than you wanted, and you still didn't file on time. And I would like to point out that the INS did not object to a late-filing brief. They're the ones who brought the error of the address problem to the attention of both me and the INS. And when all was said and done, at the end of the briefing schedule, the Board had complete briefs from both sides. The government was not prejudiced. They did not object to this late filing. They responded on the merits. But prejudice goes the other way. You're saying that the Board deprived your client of her constitutional rights by not accepting your brief. It seems to be entirely your fault that they didn't. And since they did accept the responsive brief, I don't get where they deprived your client of her constitutional rights to be heard. Your Honor, the responsive brief was limited to strictly a response. It did not repeat the arguments set forth in the opening brief. So the way prejudice works is you have to show not only that they deprived you of her constitutional rights, but also that she was prejudiced thereby. All right. Let's assume that we disagree with you that the BIA erred in rejecting your untimely opening brief. Are we still at liberty to consider your passport argument, which was not properly raised before the BIA? Your Honor, I'm not actually, in going over the record, I'm not quite sure it wasn't raised before the immigration judge. If you could cite to the record, that would be helpful. There was a question, I believe it was page 217, where Claire Kim asked the respondent, have you applied for status in Korea? No. It was brought up there. Also, I think when Mr. Excuse me. I don't understand how that was bringing it up, that question and answer. The question was answered, that the issue of have you applied for status in Korea, the R passport is in evidence. And there started to be a question directed to it. There was an objection interposed by Mr. Travioso at that point. Rather than ruling on that objection, Judge Einhorn then went off and asking questions of his own on totally different issues. All right. Let's go back to your Singh argument. It seemed to me in Singh we noted that in that case, Singh's decision to spend most of his time abroad is evidence of his lack of ties to the United States. What is your response? Which Singh case are you talking about? Singh versus Ashcroft 113 Bed 3rd. That is the abandonment case, Singh? Yes. Okay. Singh wasn't just time. It was time plus. This court brought attention to the fact that Mr. Singh took affirmative action that he told the Indian government, my permanent residence is in England. He went into the U.S. consulate and applied for a tourist visa. And where he had to establish, I have a home outside the United States in which I have no intent of abandoning. That was never done here. Mrs. Want never did that. In fact, as noted by the immigration judge, she did get two reentry permits. All right. Now, how do you put that together with that? She owns no real estate. She has very weak financial ties. Her eldest child is living. I keep forgetting which country we're in this time. In Korea, is it? Yes, the Republic of Korea. What evidence is there that indicates that she intends to leave residence? The eldest child was living in the United States. The second child is a United States citizen. The third child was seeking permanent residence based upon the mother, and in fact, subsequent to the BIA's decision, in fact, was granted by the board. I thought I read in the record, and please correct me if you already have if I'm wrong, that the eldest child had made a decision to go and live in Korea. No, Your Honor. I think she was maintaining two residences, and because of the burden of proof that that creates equipoise, Mrs. Wan then wins. There has to be affirmative abandonment. Your Honor, I have a few minutes. I'll check the record on that. Thank you, counsel. Thank you, counsel. Good morning, Your Honors. May it please the Court. My name is Jeffrey Bernstein, and I represent the government. A lawful permanent resident is given that privilege because she will make the United States her home, develop significant ties with and in the country, and eventually become a citizen. This Court's case law holds as a matter of law that an LPR abandons such status if there is clear, unequivocal, and convincing proof that the alien has remained outside of the United States for more than a brief period and does not have the continuous intention during the entirety of the departure to return to the United States within a relatively short time. Assuming that's the law, what other evidence, other than her having spent three and a half years abroad, is there that shows that Wan intended to abandon her residency? I was about to get into that, Your Honor, if I may. Again, as you noted, Ms. Wan was in Korea for 82% of the time during a four-year period, the four-year period that the immigration judge focused on, and there is unequivocal proof that she did not retain such intention continuously during any of her absences. Most important is Ms. Wan's stated intention for spending vast amounts of time in Korea, i.e., to obtain a divorce and resolve family matters. The judge found that testimony and those reasons to be utterly incredible. He didn't believe her. And that determination is supported by substantial evidence. There is no evidence compelling the opposite conclusion. He said she intended to get a divorce, but her father-in-law promised to support her if she would not get a divorce. And also an attorney relatively early. Well, that doesn't mean she didn't intend to get a divorce when she went. Well, she spent 82% of her time over a four-year period. Relatively early in that period, she was, number one, told by an attorney that she couldn't get a divorce because her husband had to consent to the divorce. And shortly after that, her testimony is that I think in approximately January 1981, her father and she agreed that she would not get a divorce and he would support her and he would leave his property to her children, again, if she would not get a divorce. That was relatively early on in the period. And then you've got three more years following that where she spends 82% of her time outside the United States. There is clearly, the immigration judge clearly did not err when he determined that her intention in coming to the United States was not the stated intention of resolving these matters. Again, her father-in-law promised to support her and did throughout this period. She was also receiving support from her husband at the time as well. And she had control of the children. Most of the time, the two youngest stayed with her, whether she was in the United States for a very short period of time or whether she was in Korea. I believe her eldest daughter spent a little bit more time in Korea. But essentially... Looks like the children bounced back and forth, sometimes in the U.S., sometimes in Korea. That's correct. But my point is, well, yeah, they bounced back. But my point is that the children, she didn't really need to resolve custody issues because she really had custody. They bounced around because she bounced around, essentially. So again, the immigration judge properly determined that her stated purpose was not her real purpose. So the only inference that can be drawn, and I think which the immigration judge implicitly drew, is that she spent 82% of her time in Korea because she chose to live in Korea. And given that, it would be impossible for her to prove that she had... It would be impossible for a reasonable fact finder to conclude that she had a continuous intention throughout these absences from the United States to return to the United States within a relatively brief period. Her intention, I think as the immigration judge implicitly concluded, and supported by substantial evidence, that she remained in Korea because she wanted to remain in Korea. She was more comfortable in Korea. She knew the Korean language. She didn't really know a lot of English, and she had a support group in Korea. Was there evidence on the language? I don't remember the evidence on the language that was in there. Yes, yes. I think she testified that, well, she testified that she wished to proceed in Korean. There were moments during the hearing where she attempted to make short answers in English, but she really wasn't able to do so, and the immigration judge said, well, you know, Ms. Won, you're going to have to continue in Korean. Thus, again, there's no evidence that she had a purpose for spending 82% of the time in Korea regarding the matters that she testified that she was spending that time in Korea for, and there are additional indicia of her intent not to return to the United States within a relatively short time. She really had no ties, as Judge Nelson indicated, to the United States. She had no permanent address for this four-year period. She lived, and during the brief time she came back to the United States from Korea, she lived in the house of her, owned by her mother, but the house where her sister lived, and she lived in this house for $500 a month, which is essentially free, I think, in Southern California, because $500 a month is, I think, to get out half of a house for $500 a month is a deal that many people would like. She had minimal family ties to the United States. She had a sister, a mother, and a brother. There's no evidence that she spent any significant time with any of them. She lived, of course, with the sister during the insignificant time she was in the United States. Eventually, she and her sister had a falling out, so at that point, Ms. Wan leased a townhome, I believe at the end of 1995 and beginning of 1996, and there's no evidence she spent any quality time or any considerable time with any of her relatives there except when she lived with her sister. Her most significant familial relationship seems to be with her father-in-law, because her father-in-law was providing her with the bulk of her support and paid for all of her trips to and from Korea. So, again, as the immigration judge, there's minimal family ties in the United States and great family ties in Korea. There's, again, no financial ties to the United States. Again, her father-in-law, all of her income came from Korea. Her husband sent her some support. Her father-in-law provided a great deal of money, and her father in Korea died and left her some money. She doesn't appear to have paid any taxes in the United States. She filed only two returns. She filed returns for the years 88 and 89 when she was living here with her husband, and he was earning money in the United States, but she didn't file that until, I think, 1997, and there is no evidence that she ever filed a tax return for any of the years following. She had no checking account until 1996 when she rented the townhouse because the falling out with her sister caused her to have to not rely on her sister's home for her bed when she returned on the few times she returned from Korea. She had no car until 1997 after being placed in a reclusion receiving when she came back to the United States in April of 1997. Again, she doesn't speak very good English, if at all, and I think also significant is the fact that she's a lawful permanent resident who's ostensibly seeking to have ties in the United States. The government granted her LPR status so she could essentially get ties with the United States because she indicated that she wanted to immigrate here and become a citizen. She traveled from the United States to Korea so that her child could be born in Korea. One would think if one intended to be a lawful permanent resident in the United States, one would want one's child to be a United States citizen. Her second child, who was born in the United States when she and her husband were living here together, so at that time they certainly, I guess, had the intent, but four years later or three or four years later, she wants to go to Korea to have her child and not have her third child be a United States citizen. That, to me, boggles the mind when we're talking about an individual who alleges she intends to be a permanent resident of the United States. Given all these matters, it's clear that the immigration judge properly determined that Ms. Won abandoned her LPR status. The immigration judge properly then concluded that she was removable and that she should be removed. The board issued a pro forma summary affirmance, essentially, and this court should affirm the administrative decision. I'm happy to discuss the due process issue. I think we've adequately discussed it in our briefs, and we think that that argument really is nothing. Thank you, counsel. Thank you, Your Honor. Thank you. Just three points in response. First of all, the Board of Immigration Appeals in Wang and this court in Cotaholion stated that the purpose of becoming a permanent resident is not to form significant ties to the United States. In Wang, they never formed them, and the Board just said, I'm sorry, you're a permanent resident. And I would also submit in Cotaholion, he never really formed substantial ties before he returned to Iran. As to family ties, Ms. Won is quite different from the other case law. She does have a U.S. citizen child. The older child is a lawful permanent resident. This is in the record. None of the other cases other than Cotaholion show the children with status in the United States, and I would submit that is a significant tie. And then as the final point about Ms. Won going to Korea to have a child, I would say that the government is speculating there, and I would just like to share I once had a comment with a consular officer in Seoul where I raised that same question. I said, I don't know why my client went to Korea to have a child, and the consular officer said, you must understand Korean culture. Korean women are biologically incapable of giving birth without their mother or their mother-in-law nearby. So this is a cultural argument. I understand it's not on the record. And it is a fair question because I once had it myself in another case. I am willing to submit, Your Honor. Thank you, Counsel. Thank you. Won v. Ashcroft is submitted. Now we'll hear Nijam v. Ashcroft.
judges: Dw Nelson, Fernandez, Kleinfeld